sonal knowledge and is fully acquainted. If any person could know
personally what the fact of incorporation was, there is no reason
to doubt that this affiant makes his statement from knowledge,
as he says, rather than upon information and belief. He may well
have examined into the subject by personal inspection of the rec-
ords in the course of his business dealings with the defendant.
Certainly there is no basis for presuming that he did not.

Motion to vacate attachment denied, with $10 costs.

---

(45 Misc. Rep. 15.)

SAUTTER v. UTICA CITY NAT. BANK et al.

(Supreme Court, Special Term, Oneida County. August, 1904.)

1. MUNICIPAL CORPORATIONS—CONTROL OF STREETS—BUILDINGS—INJUNCTION.
    A street in a city was originally a state road created by an act of the
    Legislature. The title of the abutting owner extended to the street line.
    The common council of the city authorized the use of the sidewalk, pur-
    suant to a provision of the charter, for business purposes which did not
    interfere with the public use, and to permit columns and ornamental por-
    tions of any building to encroach on any street. The council adopted a
    resolution permitting a bank to allow the columns of a building it was
    about to erect to encroach on the street not more than 24 inches, stating
    that such columns would not interfere with the reasonable use of the
    streets. Held, that the bank would not be enjoined from erecting its
    building with such projecting columns at the suit of a complaining prop-
    erty owner unless he had sustained private and peculiar injury therefrom.

2. SAME—AUTHORITY OF CITY.
    Where a city by its charter is granted the right to allow partial ob-
    structions of its sidewalks for business purposes on a highway created by
    the Legislature, the city has the same authority to authorize an en-
    croachment as if it had been originally authorized by the Legislature.

Action by Christian Sautter against the Utica City National Bank
and Ambrose B. Stanard to restrain defendants from an occupa-
tion of a portion of a sidewalk with a building. Dismissed.

Lindsley & Mackie, for plaintiff.
J. De Peyster Lynch and Thomas S. Jones, for defendants.

ROGERS, J. Genesee street, in the city of Utica, extends in
a southerly direction from the Mohawk river to and beyond the
city limits. Its width, as actually used, from building line to
building line, is from $97^2/_5$ to $97^9/_{20}$ feet. On either side from
Bagg's Square to the Erie Canal the street is, and for many years
has been, occupied by buildings for business purposes, as shops,
stores, banks, and offices, substantially in a line and fronting upon
the margin of the street. The title of the abutting owners extends
only to the street line. It is the most important business street of
the city. The street does not appear to have been laid out by the
local authorities, nor is it recorded in any book of highways of
the city or of the village or town which preceded it. It was origi-
nally a "state road," created by an act of the Legislature (Laws
1794, p. 504, c. 29) passed March 22, 1794, entitled "An act for
laying out and improving a road from old Fort Schuyler to the

Genesee river." The act appointed commissioners to lay out the road, and directed that it be laid out six rods wide; but they were not required to open and improve the same above four rods in width, and the whole, when laid out, should be considered as a public highway, and not altered by the commissioners of highways of any town or county through which it should run. The law also provided for the payment of damages where any part of the road should be laid out through inclosed or improved lands. In February, March, and April, 1902, the defendant bank acquired title to three parcels of land, each 19 feet wide and 65 feet deep, extending from the westerly margin of Genesee street to Burchard street. They were then occupied by buildings, and numbered 108, 110, and 112, which had been used as stores for many years; the store No. 112 having been occupied by the plaintiff as tenant for 23 or 24 years, for the sale of boots and shoes at retail. November 5, 1901, plaintiff's wife, Beata Sautter, purchased the premises next southerly of No. 112, being No. 114. The lot was 19 feet front and 65 feet deep, and the building thereon had been for a long time before used as a store. During the spring and summer following, the plaintiff, or his said wife, erected a four-story building, having walls of the frontage and depth of the lot. The first floor was fitted for a boot and shoe store, with plate-glass show windows in front and a glass door in the center. At the second story was a bow window extending out in front of the wall and over the sidewalk a distance of 2 feet 3½ inches. There was also a sign 12 feet and 2 inches long, about 2 feet wide, suspended 7½ feet above and across the sidewalk. Both bow window and sign were removed before the trial of this action. In September, 1902, the plaintiff moved his stock of goods into said store, where he has since carried on and still continues his said business. November 4, 1902, said Beata conveyed said premises to the plaintiff.

The defendant bank, about the time it acquired title to said parcels, Nos. 108, 110, 112, procured plans and specifications, and made a contract with the defendant Stanard for the erection of a banking house and office building thereon of stone, brick, and terra cotta, having steel beams, girders, and joists, 57 feet front, 65 feet deep, and 150 feet high, divided into ten stories, for $113,900; the first floor for a banking house, to be occupied by the Utica City National Bank, and the other floors for offices. The buildings on said lots were removed during the spring and summer following, and the work of construction begun. As designed and subsequently constructed, the front wall is built upon the building line of the street. There are built into and made a part of the front wall five columns, each resting on a pedestal, one-half being in front of the face, and the other half, apparently, within the wall, and extending up 31 feet, where it is surmounted by a cap or scroll stone. The base stone of the pedestal extends $23^3/_{16}$ inches from the face of the wall, is 55½ inches wide, and 8¼ inches thick. From this stone up to a point of 5 feet ¾ inch above the sidewalk the pedestal varies in size. The projection of the stone next above the base is 17⅜ inches from the wall, and is capped by

a stone about 8 inches thick, projecting $19^{13}/_{16}$ inches, and on top of this is another stone $6\frac{1}{4}$ inches thick, and projecting $17^{7}/_{16}$ inches. From the pedestal up, the column is constructed of stone 1 foot 8 inches thick, half round, representing a diameter of 39 inches at the bottom and tapering to 33 inches, giving a radius and consequent projection varying from $19\frac{1}{2}$ to $16\frac{1}{2}$ inches. One of these columns stands at the southeast corner of the building, next to, but not upon, nor overhanging, the plaintiff's north line. On the 30th of October, 1902, the side and rear walls had been built up to a height of 25 feet above the ground, the front basement wall to the surface, with two courses of cut stone on top and above the sidewalk. All of the stone for the first two stories had been cut and delivered, except five scroll or cap stones for the tops of the columns. The large pier stones had been delivered on the ground, and were ready to be set. All of the steelwork, beams, girts, and joists, of proper dimensions, were in the yard of the contractor. On that day the plaintiff's counsel, Mr. Lindsley, a friend, Mr. Martin, and the plaintiff's son, Samuel, called on the bank officers, and objected to the occupation of the street inside the boundary line thereof; the objection being specially pointed to certain front steps, and two ornamental pillars upon which it was proposed to put electric lights. They were invited to call the following day, when the architect would be present. Pursuant to this invitation, Mr. Martin and Mr. Samuel Sautter visited the bank officials a second time, and it was then decided to omit the posts and steps as then planned. There was conversation about the columns, but no assent by the plaintiff's representatives that they be built so as to project from the wall in the manner stated. Said columns add to the strength and ornamentation of the building, and are in keeping with its general construction. A change at that time eliminating them would have made necessary an entire revision of the front, and would also have occasioned an additional expense of about $9,600. The work was continued until the 7th day of November following, when this action was brought, and a temporary injunction obtained from Mr. Justice Scripture, restraining the defendant from proceeding with said building "further easterly than the easterly line of the face of the main part of the buildings known as Nos. 106 and 114 Genesee street." Subsequently the injunction was so modified by the justice granting it as to permit a continuation of the work to completion as it now is, the said modifying order providing that nothing therein, and the other orders made in said action, should affect the ultimate rights of the parties at the trial thereof.

The plaintiff claims that the columns in question—particularly the one nearest his store—constitute a nuisance, by reason of which he has sustained special damage, in that the street is obstructed, and the view into the windows of his store by persons coming from the north is interfered with, injuring his business by depriving him of the custom he was wont to have, and diminishing the market value of his property. The sidewalk in front of the defendant's building, from the pedestal to the curbstone, is

15.53 feet in width. From a time as far back as any of the witnesses could remember, the walk on this side of the street, including Nos. 108, 110, and 112, has been occupied by merchants and shopkeepers—of whom the plaintiff was one—with show cases, stands, and benches for the display of their goods, extending upon the walk a greater distance than the said pedestal, but without embarrassment, so far as appears, to travel thereon. I am satisfied the space is ample to accommodate any proper use by the public that has been or hereafter will be made. While it is true that the public are entitled to use the highway for purposes of travel its entire width (King v. Wright, 3 B. & Ald. 681; Davis v. Mayor, 14 N. Y. 524, 67 Am. Dec. 186), there are many instances where an occupation of a highway for a purpose other than travel, has been held lawful, travel not being inconvenienced by reason thereof, viz.: A hydrant (Ring v. City of Cohoes, 77 N. Y. 83, 33 Am. Rep. 574); stepping stone (Dubois v. City of Kingston, 102 N. Y. 219, 6 N. E. 273, 55 Am. Rep. 804); Robert v. Powell, 168 N. Y. 411, 61 N. E. 699, 55 L. R. A. 775, 85 Am. St. Rep. 673); hitching post (Hubbell v. City of Yonkers, 104 N. Y. 434, 10 N. E. 858, 58 Am. Rep. 522); a square stone placed at a point where the road turns at right angles to protect a fence from careless drivers (Hulse v. Town of Goshen, 71 App. Div. 436, 75 N. Y. Supp. 723); and a shade tree, with proper guard for its protection (Dougherty v. Village of Horseheads, 159 N. Y. 154, 53 N. E. 799). Areas under a sidewalk, coal holes, cellarways, gratings, and other openings for the convenience of the abutting owner, are common, and not unlawful when properly guarded, and maintained with consent of the municipality. Babbage v. Powers, 130 N. Y. 281, 29 N. E. 132, 14 L. R. A. 398; Jorgensen v. Squires, 144 N. Y. 285, 39 N. E. 373; Trustees of Canandaigua v. Foster, 156 N. Y. 354, 50 N. E. 971, 41 L. R. A. 554, 66 Am. St. Rep. 575; Broadbelt v. Loew, 15 App. Div. 343, 44 N. Y. Supp. 159; Id., 162 N. Y. 642, 57 N. E. 1105. Watering troughs, fountains, monuments, statues, and the like are frequently found in conspicuous places in the streets of populous cities, and it can hardly be assumed that their presence constitutes a nuisance per se, so long as they do not materially impede the rightful use by the public. Even a market place, erected by the municipality, upon land condemned for and being a portion of a public street, is not an unlawful obstruction. Henkel v. City of Detroit, 49 Mich. 249, 13 N. W. 611, 43 Am. Rep. 464.

The charter of the city of Utica, as amended by Laws 1903, p. 2, c. 2, provides that:

"The common council may permit the use and occupation of streets, sidewalks or public places for such business or public purposes as shall not interfere with the reasonable and substantial uses of the same by the public, upon such terms and conditions as it may deem proper, and it may likewise permit steps, porches, show windows, bow windows, columns, pilasters and ornamental portions of any building to encroach upon any street to a specified extent, where in its judgment the same will not interfere with the reasonable and substantial use thereof by the public."

Pursuant to this statute, February 16, 1903, the common council, by a vote of ten to two (one of the negative votes having been cast by the plaintiff's son), adopted a resolution giving permission to the bank to have the five columns of the front wall of said building encroach and project on Genesee street not exceeding 24 inches into the sidewalk, from the face of the building line, as then existing, at each side of the said building, and also stating and determining that the encroachment so permitted did not and would not interfere with the reasonable and substantial use of said 'street and of the sidewalk by the public. The permit was an act granted by the sovereign power of the state. Having been granted by the authority of the Legislature regarding a highway of its own creation, it has the same effect as though the Legislature itself had authorized the encroachment. Village of Carthage v. Frederick, 122 N. Y. 268, 25 N. E. 480, 10 L. R. A. 178, 19 Am. St. Rep. 490. Such delegations of power are sanctioned by the courts, and have been exercised many times. Hoey v. Gilroy, 129 N. Y. 132, 29 N. E. 85; Jorgensen v. Squires, 144 N. Y. 280, 39 N. E. 373; Wormser v. Brown, 149 N. Y. 163, 43 N. E. 524. In the Hoey Case the erection was upon Great Jones street, in the city of New York, of "a permanent iron structure, one hundred and ten feet in length and nineteen feet in width, covering the whole sidewalk, and extending over the curbstone about twelve inches. The roof was constructed of light corrugated iron, supported by iron columns about three and a half inches in diameter, placed about twelve feet apart and next to and along the inside of the curbstone, the lowest point of the roof being about ten feet above the sidewalk, the iron columns being imbedded in the soil of the street." The maintenance of this structure was justified by the fact that the municipal authorities having power to "regulate the use of streets and sidewalks for signs, sign posts, awnings, awning posts, horse troughs, urinals, telegraph posts, and other purposes," had authorized it. Judge O'Brien, writing for the court, says:

"The Legislature, by virtue of its general control over public streets and highways, has the power to authorize structures in the streets for the convenience of business, that, without such authority, and under the principles of the common law, would be held to be encroachments and obstructions. This power it may delegate to the governing body in a municipal corporation." Page 136, 129 N. Y., page 86, 29 N. E.

He further says:

"It is doubtless a very serious obstacle to the full and uninterrupted use of the street by the public, but, so long as the city authorities had power to authorize its erection, and have exercised that power, the courts cannot ignore their action. The common council can at any time abate such obstructions and prevent them in the future by a repeal or modification of the ordinance. The remedy for such improper use of the streets is with the city government, and not the courts." Page 140, 129 N. Y., page 87, 29 N. E.

In the Jorgensen Case, Judge Andrews says:

"The authority to construct vaults under sidewalks, or to make openings therein for a cellarway, or to inclose an area within the line of a street, is not an incident of ownership of the adjacent premises, or implied from such ownership, however convenient, or even necessary, the exercise of such an

authority may be to their full enjoyment. The implication of such a right as one annexed to the land and arising out of ownership merely would or might lead to embarrassing conflicts, and interfere with the control and regulation of the streets, which, in the interest of the public, is reposed in public authorities. But it is competent for the Legislature to authorize a limited use of sidewalks in front of buildings in cities and villages for stoops or cellar openings, or underground vaults, for the more convenient and beneficial enjoyment of the adjacent premises. While such uses may restrict somewhat the free and unembarrassed use of the streets for pedestrians, the general interests are subserved by making available to the greatest extent valuable property, increasing business facilities, giving encouragement to improvements and adding to taxable values." Page 284, 144 N. Y., page 374, 39 N. E.

### In the Wormser Case the court say:

"The Legislature, by virtue of its general control over public streets and highways, has power to authorize structures in the streets, which, without such authority, and under the common law, would be held to be encroachments or obstructions; and this power it may delegate to the governing body of a municipal corporation." Page 171, 149 N. Y., page 526, 43 N. E.

### The court say further:

"As the bay windows erected by the defendants did not extend beyond the building line of the street a greater distance than the stoop upon the plaintiffs' adjoining property, and therefore there was no practical interference with the use of the street, it would seem that upon the authority of the cases cited the plaintiffs' complaint in this action was properly dismissed. A finding that the defendants' windows interfere with the light and air and affect the same is extremely indefinite, especially where there is no finding or proof that the plaintiffs have suffered, or will suffer, any pecuniary damage or material or irreparable injury by reason of the erection of such windows. Such a finding can hardly furnish a basis for judicial action, and is, we think, too uncertain to justify this court in interfering with the decision of the court below. An interference with the view from the plaintiffs' windows would not entitle them to the relief sought." Page 172, 149 N. Y., page 526, 43 N. E.

"What the law sanctions and authorizes is not a nuisance, although it may cause damages to individual rights and private property." Per Earl, J., Uline v. N. Y. C. & H. R. R. R. Co., 101 N. Y. 98, 107, 4 N. E. 536, 540, 54 Am. Rep. 661.

The public, represented by the common council, make no complaint because of the encroachment. The only party thus far challenging the right of the bank to erect the columns is the plaintiff, and he does not represent the public. Moreover, before he can recover in this action, the plaintiff must establish, not only that the erection complained of is a public nuisance, but that he sustains private and peculiar injury; an injury which is substantial, not merely nominal. Fort Plain Bridge Co. v. Smith, 30 N. Y. 44; Adler v. Metropolitan El. R. Co., 138 N. Y. 173, 33 N. E. 935; Wakeman v. Wilbur, 147 N. Y. 657, 42 N. E. 341; O'Reilly v. New York El. R. R. Co., 148 N. Y. 347, 42 N. E. 1063, 31 L. R. A. 407; Ackerman v. True, 175 N. Y. 353, 361, 67 N. E. 629.

In the Fort Plain Bridge Case, Judge Mullen, writing for the court, said:

"But assuming that it is a public highway, and that the bridge is an obstruction to navigation, and therefore a public nuisance, yet no one has the right to abate it, or sustain an action for damages occasioned by the erection, unless he has himself sustained some damages not sustained by the rest of the community." Page 62.

In the Adler Case, Andrews, C. J., says:

"The authorities are numerous that special injury is an indispensable condition to the maintaining by a private person of an action to abate or restrain a public nuisance." Page 180, 138 N. Y., page 937, 33 N. E.

In the Wakeman Case, Judge O'Brien says:

"The obstruction of a public highway is an act which in law amounts to a public nuisance, and a person who sustains a private and peculiar injury from such an act may maintain an action to abate the nuisance and to recover the special damages by him sustained. The extent of the injury is not generally considered very important. It should be substantial, of course, and not merely nominal. * * * When the damage or injury is common to the public and special to no one, then redress must be obtained by some proceeding in behalf of the public and not by a private action." Pages 663, 664, 147 N. Y., page 342, 42 N. E.

In the Ackerman Case the citation from Judge O'Brien's opinion is quoted with evident approval. Page 361, 175 N. Y., page 630, 67 N. E.

In the O'Reilly Case the complaint was dismissed, and an injunction denied, because of a "failure to prove substantial monetary damage."

What injury has come to the plaintiff? No part of the bank building occupies or overhangs any portion of his land. He is not deprived of access to the street, nor of light or air. Both buildings face the east. The bank building is at the north, and neither it nor the encroaching column can cause so much as an offending shadow to be cast upon the plaintiff's property at any hour of the day in any season of the year. It is not shown that the plaintiff's sales have been diminished to the extent of a single dollar, nor that any customer has failed to find or been deterred from coming to his store by reason of the defendant's building. On the other hand, it is quite probable that, being a conspicuous structure, occupied by many tenants whose business necessarily brings many other persons there, and as a banking house, to which the patrons must frequently resort, the building will increase the plaintiff's trade and profits. It is true that to a person approaching the plaintiff's store on the sidewalk from the north line of vision will not strike his show windows quite so soon as if the base and pedestal of the southerly column were not there. That a proper display by a merchant of his wares tends to attract buyers is self-evident, but it is not apparent that this slight obstruction of the view of the window at all shuts out the view of the goods inside. Ordinarily the most favorable point from which to see through a window is a convenient distance from and at right angles to the glass, but as the angle is lessened the ability to see through is likewise diminished. The law of the reflection of light from polished surfaces is well known. The reflected ray lies in the plane of incidence, and the angle of reflection is equal to the angle of incidence. So it appeared, in the case at bar, from observations made south of the plaintiff's store, at points about the same distance from the face of the wall and the store as those made on the north side, that little, if any, difference existed between the two sides as to seeing into the store. The circumstance that the projecting

columns are the same distance in front of the wall of the defend-ant's building as the plaintiff's is significant. The view of the bank front from the sidewalk is obstructed just as much as the plaintiff's; indeed, more. The bank has five columns, and the plaintiff complains of but one. It cannot be conceived that intel-ligent, experienced men—as the officials of the bank may be as-sumed to be—have so constructed their building, expending the large sum of money which it cost, as to repel, rather than attract, passers-by. If they have not done it for themselves, they have not done it for the plaintiff. Even though the column does offend the eye of the plaintiff, or is otherwise distasteful to him, he must en-dure the objectionable structure as a part of the price he pays for living and doing business in a thrifty, prosperous city. "The com-promises exacted by the necessities of the social state, and the fact that some inconvenience to others must, of necessity, often at-tend the ordinary use of property, without permitting which there could in many cases be no valuable use at all, have compelled the recognition, in all systems of jurisprudence, of the principle that each member of society must submit to annoyances conse-quent upon the ordinary and common use of property, provided such use is reasonable, both as respects the owner of the property and those immediately affected by the use, in view of time, place, and other circumstances." Per Andrews, J., Cogswell v. N. Y., N. H. & H. R. R. Co., 103 N. Y. 10, 8 N. E. 537, 57 Am. Rep. 701.

From what has been said the conclusion follows:

(1) That the structure complained of is not a nuisance;

(2) That the plaintiff suffers no substantial damage by reason there-of; and,

Finally, that the complaint should be dismissed upon the merits; but because of an order made, permitting the service of a supple-mental answer, it must be without costs.

Judgment accordingly.